Good morning. May it please the Court, Kirk Passage for Raymond Manzarek and Doris Turing. Your Honors, the most fundamental mistake I think that was made below, and I think there are a number of fundamental mistakes that Judge Reel made below, starts with the notion that a policy exclusion can be plain, conspicuous, and clear when the policy has not been delivered to the insurant. The Doris Turing policy was not delivered to either of the insurants until after the lawsuit was filed, about two months after the policy coverage began. Let me ask this. Were summaries given? How come they didn't have knowledge of the policy before they paid the premium? Your Honor, what the record shows with respect to both policies is that both policies were actually delivered months after the policy inception date. The first policy to Mr. Manzarek himself was about four or five months later. Well, I understand they were delivered late, but you're telling us that they bought a pig and a pork? What I would tell you, Your Honor, is that the representation was, yes, they bought a pig and a pork, to be direct about it. That's the way the insurance business operates frequently, with policies being delivered months after the coverage is supposed to start. Now, this record shows that the only representative involved for any party was St. Paul's Representative, the entertainment company that they were using to sell these policies. In fact, the claims adjuster, the record shows, didn't even have the policy when she decided tentatively to deny coverage. So she made a decision to deny coverage without having a policy in front of her, with the decision to request a copy of the policy. So it's not just Doris Turing that didn't have the policy. The claims adjuster didn't have the policy either. But, Mr. Passage, what we're really talking about here, you're not arguing that there wasn't such an exception, an endorsement. You're not arguing that the Doors went in and made a deal with the insurance company for an insurance policy without the endorsement. You're not arguing, and there isn't anything in this record, that you said this and they said that, and now they provided something different. All we got is, because it didn't come until after the coverage was denied, that therefore there's something wrong about that. In the normal case, if in fact this was a big problem, one argues, I went in and I didn't ever get. I went in and bargained, and here are the references, here's the conversation, here's the stuff, so that I can prove, so that I can argue fraud in the inducement, or I can argue something like that. All we're arguing here about is whether the FEL endorsement is illusory or not. That's all we're arguing. I mean, I went through every one of the complaints. I've tried to find some allegation which would lead me to something more than illusory, and I couldn't find it. Your Honor, I think we're actually arguing several things, but starting with the heart of your point, I think it's very simple. On a 12b-6 motion, we didn't have the opportunity to go out and produce the evidence to show, for example, that St. Paul's representatives made certain promises. Why didn't we allege it, so they couldn't get rid of it in the complaint, or amend, or something? Your Honor, we would have been happy to have amended the complaint if that was the concern, but Judge Reel did not give us the opportunity to amend the complaint. He denied without leave to amend on first blush, so we had no discovery, no opportunity to amend, no opportunity to address these issues. If you had a chance to review the transcript, he said essentially nothing in argument. Now, I think following up on your point earlier, opposing counsel did a great job of papering Judge Reel's decision, and putting a lot of stuff in there, but we didn't have the chance to develop the evidence to demonstrate misstatements were made. What we do know is on the face of the policies that were in the record, we know a couple of things that I think are determinative. We know that this policy promised a million dollars of advertising injury coverage for this insured in the business of music, and in the business of rock tours. That's what we know. That's evident on the summary of the coverage, going back to Judge Fletcher's conversation or question, the policy itself contains summaries of the coverage. Those summaries expressly represented advertising injury for Doris Turing and Mr. Manzarek in their field of business, which was described as concerts and rock tours. That's their business. So when you sell, and I do believe, Your Honor, dead on, I believe this is a clear case under Safeco and its progeny of a policy exclusion that is invalid and should not be enforced. But I don't think we even have to win that one, because as a minimum, these folks have to show it's conspicuous, plain, and clear. And there's nothing that satisfies any one of those requirements. We might agree that if we looked at that exclusion buried 45 and 54 pages into a policy, that if we looked at it, and if it was called an exclusion, or if it was found in the exclusion section, or if on the declarations page where it said $1 million of advertising injury, just kidding, because there's no advertising injury coverage under this policy. Well, that's an illusory argument. It is. Whether there's advertising coverage under this or not is, you know, if you, if they go out and market a line of guitars, or a line of clothing, or a line of something else, that might be included under this policy, even with the FEL endorsement. The only thing that the FEL endorsement actually covers is clear and unambiguous as to what it is they don't cover, which is absolutely clear, the kind of thing that now we have claims about are not covered. And that's the problem. They delivered the FEL endorsement with the policy. And I got nothing in this record to suggest to me there was anything else that was bargained for. I agree on what the record shows, Your Honor, and I agree that that's because there was no opportunity to conduct the discovery that's essential to demonstrate how this... It doesn't take a lot of discovery from what I've done in old Idaho, maybe we're way out of it, to just plead, hey, I went in and I told those boys I wanted this kind of coverage because I was worried about it, and they told me they were going to give it to me. It doesn't take any discovery. Your Honor, I don't think that does take discovery, and I don't disagree with you in that respect, but these are general liability policies that are sold to provide comprehensive coverage. The very nature of that coverage is everything is covered that's not expressly excluded. Now, I would agree, if you look at that exclusion itself, had it been correctly labeled, had it been identified, had it been listed on the declarations page, then the question is, are there other reasonable interpretations of that exclusion? The one you outlined about them going into a clothing line of business is contrary to the Maryland Casualty case. You have to look at what the business is at the time they engaged in it. These guys were rock stars. The four people in this band were from two of the world's largest selling bands in the world, period. Their business was music. There's no evidence to suggest they were ever considering any other kind of business. Now, what reasonable interpretations could there be consistent with the language of this endorsement? There were several identified in the record, Your Honor. One is consistent with Vivid, the Vivid video case, where the question was in Vivid, could you use your own name? You have two of the founding members of the Doors who were using the Doors name as Doors of the 21st century. You have Mr. Dinsmore, the drummer, who is talking about the fact that his reputation is disparaged from having another one of the world's best-known drummers from the police replace him. These were people using their own history, their own name. There's nothing inaccurate about this. This isn't a fake band. It's not like the Platters that are touring the country today. It is two original founding members of the Doors, principal songwriters of the Doors. They were doing what under Vivid Vividio is a perfectly legitimate enterprise to be covered by advertising injury coverage even under this endorsement. If we look at Western and Lew and this court, the Ninth Circuit, in February of last year, after the briefing was completed, but the Ninth Circuit noted, as did the district court in Western, that what you're dealing with are claims that are outside of the pure traditional, in that case, trademark claims. We have breach of fiduciary duty claims here as well. There are a variety of claims that on their face could fall outside of this exclusion as worded. That's exactly why Trident recognized the claim that you have to be given an opportunity to develop extrinsic evidence. In this case, the two key players are St. Paul and its agent and representative who sold this policy. We had no opportunity to develop either. We did plead, I think, more than sufficiently on a notice standard, the elements that satisfy the requirements. But I do agree with Your Honor, if we don't win this on illusory, then we're talking about conspicuous plain and clear. We're talking about the need for extrinsic evidence. We're talking about denial of leave to amend right out of the box. If there were deficiencies in the pleading, then we are entitled to a right to amend. It is the same thing with respect to bad faith, only frankly, I don't think the bad faith one is even close. The entire premise, in essence, of the bad faith argument made below was, if there's no coverage, then there is no bad faith. Whether I agree with that or not is irrelevant, because it means that the argument on bad faith rises or falls on whether there is a sufficient indication of no coverage. What has happened, though, that's omitted is St. Paul does come up and argue, well, our decision was reasonable. There was at least a genuine position before it. Not on this record. This record has only the allegations and the complaint to look at. And the allegations and the complaint talk about things like the completely inadequate investigation. That is the benchmark standard under this Court's decisions in Handgarten, and certainly under the California Supreme Court's decision last year, where they revisited the duty to investigate and how you plead those things in Wilson v. 21st Century. That's a November 2007 decision where they looked at the genuine dispute doctrine. And they looked at whether or not evidence of an incomplete investigation could survive to get to trial on a bad faith basis. And there the California Supreme Court found that genuine dispute does not immunize an insurance carrier from liability for its other bad faith conduct. There is a bunch of it here, starting with the claims adjuster who denies coverage without a policy. That is one of the violations of the most fundamental points. That claims adjuster had no clue what that endorsement said. At least that's all the evidence shows. She doesn't cite it. What she says in the denial letter is, we don't have it. I'm preliminarily denying coverage without knowing what my policy says. That's a biased investigation. So I do think, Your Honor, we do have the three separate arguments. Obviously, we're leading with the illusory argument and safe code that should invalidate this exclusion in the context of a... And by the way, if I want to develop the argument that we're making, I frankly could not have asked for a better reference because the way this endorsement reads, it applies an exclusion to advertising injury in your field of entertainment. They are promised up front coverage in their field of entertainment. That's what this policy represents in the policy summary, on the declarations page, in the coverage grant. When you turn to the exclusion section, it doesn't say anything to the contrary. They then say, we're going to sell you advertising injury coverage in your field of entertainment. And we are then taking it away 50 some odd pages later in an endorsement that's referenced one place, the 17th line of 26 single space lines without explanation. If they wanted to make it clear, as the California Supreme Court suggests in You don't promise a million dollars of advertising injury coverage if you're not selling it for the field of entertainment these guys are in. You say zero. That's crystal clear. When you tell someone zero, they understand it. It's very different than saying you get a million dollars of coverage. The other thing they could have done in this easy-to-read policy, as Judge Riehl refers to it in the decision that they wrote for him, in this Hey, we're going to exclude anything that has to do with your field of business. If you go into new business, maybe we won't exclude that. Or if you're singing Light My Fire on stage one day and you slander somebody, maybe that might be covered or might not be covered. They didn't give Doris Turing or Mr. Manzarek any options. They sold a policy on its face that provided barred coverage. They stuck an exclusion at the end that their own adjuster didn't even know about. I don't think that satisfies any test. And if it's close, we were entitled to have a right to amend or restate the claims. Let me ask you, when was the summary given to your client? Summary was delivered at the same time as the policy on the record before, so there was no chance. I mean, all we could do was speculate. Those were my questions because my worry was, in reading the complaint, I've seen a lot of these things alleged. And I, frankly, was worried about what we have alleged here and what I have to deal with. Because there's no question somebody doesn't deliver the policy until after you've got a problem that's going to square you right in the face, unless you look at what the complaint is that's alleged against the other side. That's why I had to look at the complaint. No, and I understand that completely, Your Honor. And I think that I will say St. Paul was very candid in admitting that they did not deliver the policy beforehand and that their adjuster didn't read the policy when she preliminarily denied coverage. So, thank you. Good morning. May it please the Court, I'm Andrew McCloskey. I'm here on behalf of St. Paul. I think that these, the delivery argument is, that's an 11th-hour argument, just in an effort to... Well, what are the facts on the delivery argument? Well, we don't know the facts, Your Honor. They're not before the record. The underlying, not the underlying, but the complaint in this matter asserts causes of action against St. Paul for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief. It doesn't set, it doesn't seek rescission. It doesn't, in any way, attempt to set aside the terms of the policy based on late delivery. You know, in general, it's very common in the insurance industry that there is a lag time between when somebody goes in and negotiates the policy and pays the premium before the policy is actually issued. It just takes time for that process to take place. Well, we're on the record where we can find out when the insured had notice that this paragraph that you claim is visible and plain and unambiguous, it's plain and unambiguous when you finally find it on down, 65 pages down in the document. But when did the insured have notice of that paragraph being in the policy? Well, I don't think that that's in the record, Your Honor. Well, why isn't it? Why, did the judge throw it out of court before you got a chance to do any discovery? Well, it wasn't an issue. If you look at the way that they alleged their complaint, they basically said that we breached the contract by giving an overbroad meaning to the field of entertainment limitation endorsement. They then attached the underlying complaints, and they then attached the policies. Now, in our view, and I think that the district court agreed with this view, you can take all of that and you can determine as a matter of law that the underlying complaints did not raise the potential for coverage under the policies. I think that you can do that based on what they put in their complaint. Nowhere in their complaint did they allege that this delivery would somehow, or the late delivery would somehow cause the policy exclusions not to be applicable. But it is clear in the record, isn't it, counsel, that on February the 5th of 2003, you were sent a letter for coverage. On February the 18th of 2003, your particular coverage administrator denied the coverage, and you didn't deliver any policies until March the 5th of 2003? That's right in the record. I think it was a provisional preliminary denial. Well, the preliminary was February 18th, but on March the 5th of 2003 is the first time the policies came. That's what's in this record. I don't think that changes the content of what's ultimately in the policy, though. Well, I understand that, and that's what I was talking to counsel about. But I guess the problem comes, and that's where we are here, whether that's a breach of contract or not depends on what he's going to allege. And that's why I took him into that particular situation, but that's why Judge Goodwin's questions are pretty straightforward. I mean, if you don't get the coverage there until at least a month after they've sent for any coverage under your policy, and you've already denied it on February the 18th, not even having looked at the policy yourself temporarily, then can we get to the fact that they ought to have not been allowed to amend? Well, first of all, I think you need to understand that St. Paul knows what its exclusion says. So even though the policy hasn't been issued, it knows the field of entertainment limitation endorsement. It knows that that's attached to the policy, and it knows what the language of that endorsement is. Now, do they charge a premium for advertising injury coverage? To my knowledge, no, they don't. It's a commercial general liability policy. It provides as counsel has said, it provides broad coverage. And if there were no advertising injury coverage, would the premium be the same? Yes, it would, Your Honor. I believe it would. But that's how the policy works. It provides a very broad level of coverage, which then, whatever risk St. Paul does not actually want to extend the coverage to, it's then changed to exclusion, and in this case, by endorsement, which added the FEL exclusion. Well, you know, counsel, it just rings wrong that there isn't a capacity to amend here. Nobody really knows what the insured knew. Nobody knows what the insurer thought it was doing by not, by selling this kind of coverage to people who they don't intend to cover. It seems to me that this is a case that calls out for the judge to say, what's wrong with the complaint? Go back and try again. Okay. I understand your concern, and here's how I would respond. First of all, the policy is what the policy is. It really doesn't matter if there was this one month, two month, three month delay in delivery of the policy. It would have been the same regardless. It's going to include the FEL endorsement. Now, I think the key here is that they have not put up any reasonable alternate interpretation of that language that would somehow show that it would provide coverage in this particular case with this particular fact pattern with respect to these underlying complaints. I think that's the key here. That is the key if we're going to only argue about what it says. But if we're going to argue about the inducement, the putting it together, and all of that, then we're not going to argue about what it says necessarily. If we're going to argue about if in fact, and that's the thing that I was really going to talk to you about. It seems to me that your summary of insurance suggests they have advertising coverage. The summary of insurance is what you see first. You've got a million dollars sitting there, and with a summary of insurance and a million dollars sitting on the front of it, you can't find the fact you don't have the million dollars of insurance for advertising injury until you go back to an FEL endorsement, which is 50 pages away, and not in big language, not right on the front of it. So the biggest argument they're going to make is that the clause itself is illegal for public policy's reasons, for the fact that it is just unconscionable to have this on the last page, or buried in the middle of their contract. Now that's their argument, and that's the reason that it's a worry about whether it comes on summary judgment for breach of contract. And that's what I want you to talk to me about, because I can talk a lot to him about what he's got to allege, but you've got to tell me how do I get around that breach of contract on an unconscionability status. Well, first of all, there's nothing illusory about it. The policies do provide advertising injury coverage, just not advertising injury coverage for this particular fact pattern. Or for this particular individual. No, I think that that's incorrect, respectfully. I think that if he were Maybe that's something that needs to be developed, doesn't it? If it was known to the broker that all that these people did was their music and peddle their music. They aren't in any other sidelines at all. I don't think that changes at the end of the day, that St. Paul has the ability to actually go and restrict that coverage. Well, they shouldn't sell it in the first place, if it's clear that these people could never take advantage of it. But they sold a package policy that also includes coverage for general liability claims. It also includes some first party property coverage. It also includes automobile liability. It includes a number of things. Now it also includes advertising injury, just not for this particular claim. And I think that St. Paul is entitled to limit the coverage in that manner. It does not make the contract illusory. You know, we have no control over what they do in their business. Now, we may understand that, you know, they are going to go on tour as the Doors. They're going to promote their activities as the Doors. They're going to sell CDs as the Doors. They're going to do a number of things. That's a risk that we did not want to cover advertising injury claims arising out of that. And that's why this endorsement is attached to the policy. So I don't see that it's illusory at all. We could come up with a number of fact patterns that would somehow establish that there would be advertising injury under a different factual scenario had it been presented in the underlying contracts. Now, as to the Dinsmore suit, one of their claims was not that what they were doing was false, but just that they were appropriating the name of the individual. Now, is that excluding by content, or is it covered? If I follow your question, I believe that that's excluded. I mean, that still falls within the advertising injury. But isn't there some possible ambiguity there? Well, there's no other portion of the policy, no other part of the insuring agreement that that particular fact pattern would fall within. So it would have to be within the fact that if you're appropriating the name and the only way that you're doing it is within your entertainment business, that's going to be excluded from coverage. So I think that what we have here is a very broad field of entertainment limitation endorsement. It's broader than the one that was at issue in, for instance, in Vivid Video, upon which the appellants are relying. And in that case, the only thing that they were dealing with was misappropriation of trademark and the distribution of videotapes. And so the court said, well, if we look at the field of entertainment limitation endorsement, it's subject to two equally reasonable competing interpretations. One would say that the insured has a reasonable expectation that it would provide coverage for that, because that distribution of the videotapes is not necessarily within what the insured would understand its field of, or business of entertainment to include. We don't have that here, because St. Paul's field of entertainment limitation endorsement is broader. And the way that it actually works is, you know, it, let me find the language so that we're all on the same page. Here it is. It actually references properties of programs. Okay, and properties of programs means properties, products, programs, materials, or other matter that are within the field of entertainment business. Okay, this is different from Vivid Video, that language. So even under St. Paul's language, if you were presented with the same fact pattern as Vivid Video, the distribution of videotapes, it would clearly fall within the terms of this exclusion. So I don't know that that, the reliance on that case actually saves the day for the appellants. But again, it brings me back to the point that they have not put up any reasonable, objectively reasonable alternate reading of this exclusion. Okay, so without that, I don't think that we get into any of this extrinsic evidence. Well, there isn't any serious argument about ambiguity in the literal meaning of the word, because there's only one meaning that can be read into that paragraph. But there is a question about why the plaintiffs wouldn't be allowed to amend their complaint to allege that they had no notice or no reason to know of this illusory policy. If they had, they might have been able to allege that they were blindsided on this thing. The first they heard of it is when they get the letter saying we have no coverage. Had they already paid the premium? I don't know whether they had paid the premium or not. I would assume that they had. They might have a failure of consideration. So. But I think, you know, that goes back to my earlier point that the policy is the policy. The policy would have been the same had it been delivered to them the day that they applied for it. It doesn't change what the terms of the policy ultimately are. Yeah, but doesn't it, is it irrelevant that the insured doesn't have any notice of what he's just bought in the way of insurance? I would be a little concerned if that was the law of California. You've got a panel here. It's all from up in the snow country. All of us are unfamiliar with California's nuances about entertainment law. But if I bought a policy for a ski resort that I operate and it covered general liability and including libel and slander and getting your car bumped in the parking lot and one thing or another, but on the way down in the bottom of the contract it says this does not cover any injuries caused while skiing. But I didn't know that that was in the policy until three months or so after I had a claim filed. Because you didn't deliver the policy to me. I wouldn't have bought it if I had known it had that clause in it. Well, that's a different cause of action. That's not breach of contract. That's not declaratory relief. It's not breach of the implied covenant of good faith and fair dealing. It's something else that isn't alleged here. Well, maybe we should give them a chance to allege what is consistent with the facts. And we don't know what those allegations might be. I would suggest to you that they would have done that the first time if they had those facts. And the fact that they're now bringing this up for the first time in appeal, I don't think that it should carry any sway with before. I think, again, that this matter should be determined as a matter of law based solely on the clear and unambiguous terms of the policies as compared to the underlying complaints. I also do think that this endorsement is clear and conspicuous. There's been some discussion as to it being buried 45 pages into the policy. Well, frankly, it's a big policy. There's a lot to cover in that policy. It's broken up into very specific sections. The first section is the deck page. Then you've got some conditions. Then you have the general insuring agreement, which itself is 20-some odd pages. After that, you have certain endorsements. Frankly, and in fact, the automobile coverage comes after the field of entertainment limitation endorsement. I can't imagine that that somehow means that there's no automobile coverage simply because it commences at the 60th page of the policy. That makes no sense to me. The fact that this is a freestanding endorsement, which you can plainly read right there in front of you, it's one of the first endorsements that specifically says it limits coverage, I think that it's clear and conspicuous. Counsel, what do we do with the claim that there wasn't a fair investigation, full and fair investigation, which is required by the policy? First of all, I think that if you read through those allegations very carefully, you'll see that they're without merit. You don't really even need to get that far, though. If there's no coverage, then under California law, there's no bad faith as a matter of law. I mean, if the policy doesn't provide coverage, then you can't be found in bad faith. I mean, secondly, as well, this dispute focuses on a dispute over the legal interpretation or the interpretation of the policies themselves, which is a legal issue. And I think that a genuine dispute doctrine would apply clearly in that case. And I think the district court agreed when they looked at it and said, well, you know, this is a matter of false interpretation. In fact, he agreed with our interpretation. How do we know he agreed with anything? Where's the transcript that tells us what he thought? I believe the underlying transcript's in the record. I don't have it here in front of me. But where's the language? Tell me what he said. Off the top of my head, unfortunately, I'm unable to do that. But I believe that it's in there. I guess my biggest worry, and this is one where you got to help me, this case was removed to district court on April 6th of 2006. On April 11th, St. Paul filed the motion to dismiss. On May the 15th, the court heard the argument. And on May 19th, dismissed with prejudice. So it was in district court not more than a month, well, a month and a half. And by district court, a month and a half, dismissed with prejudice. And there's no question they had a breach of contract for failing to defend, breach of implied covenant of good faith and fair dealing, and declaratory relief. And so we're looking at those. Breach of contract for failing to defend. But I guess my worry is, on a discretionary basis, having been in court now for a month and a half, no even a trial, on the docket, nothing, that we didn't even have a chance to amend. And how do I then affirm the discretionary dismissal? Okay. Well, I think the way that I would respond to you in that respect is simply that if you look at the complaint against St. Paul, and again, you look at it, it's breach of contract, declaratory relief, and breach of the implied covenant of good faith and fair dealing. They were kind enough to attach the policies. They were kind enough to attach the underlying complaints. The whole matter can be determined on that basis. At that point, I think that the district court was correct in determining that the policy is clear and unambiguous, and it provides no coverage for the underlying complaints. Now, at that point, it's up to the appellants to establish that there is, they have the ability to actually amend the pleading such that it would state a cause of action. And it should not do that before the district court. That's what I was going to ask. Did the court ask them if they wanted to amend? Frankly, I don't know if the court asked them point blank or not. I didn't see it in the record. Did the appellant argue the things that he's arguing now, like illusory? Did he argue that? It seems to me he did, right? I think that the arguments have become more refined as time has gone on, but I think it's safe to say that they probably did bring them up. Did he argue fraud in the inducement? I don't know that they did. I didn't ever see it. Did he argue anything about the fact that this was a contract which is unconscionable? I don't know that that was there either. I didn't see it. So in sum, I don't think they met the burden then to show that at that juncture that the complaint could be amended. Thank you very much. Judge Smith, starting at the end of your questions, I don't believe the word unconscionable crossed my lips in oral argument. I did argue SAFEco and McKinnon, which stand for the same proposition. We argued it was illusory, it was an unfair deprivation of coverage, number one. Number two, Judge Reel didn't ask us about amending. He was silent at the hearing. The no need to amend came up when these folks papered it, and Judge Reel signed it, and that's when we lost the right to amend because they elected to paper and take it away from us without a chance to be heard. Number three, Judge Reel said nothing at oral argument on any of the points. He essentially sat there. There was no give and take. There was no questioning. It was me talking essentially to myself. So there was not a dialogue. He issued the minute order. It was one sentence, saying denied and directing them to prepare the papers. A lot of what we see come up out of what they put in their version of the order after the fact. Some of the other questions that were asked, I was actually rather fascinated at the notion that Mr. McCluskey would suggest that St. Paul was giving away millions of dollars of coverage with no premium charge. The only premium reference in there is a per performance rate reference. It's in the policy. This company sold insurance. He said, we did not want to cover the risk incurred of them touring. That is false. St. Paul expressly covered the risk of touring. That's how they calculated the premium, and they expressly put provisions in their policy that dealt with the fact that number one, Doors Touring, as the name suggests, is a touring organization. It's a band. Number two, they calculated the premium based on performance. Number three, they referred to these guys as entertainers, musicians. And number four, the only evidence of a broker, going back to Judge Fletcher's comment, there's no evidence of a broker in this record. The evidence is that St. Paul's authorized representative, their words on the face of the policy, is the go-between intermediate. No evidence of an insurance broker representing anybody on this record. With respect to, did we raise the question of not getting the policy? Absolutely, we raised that issue, and it's in the record. For example, one of the things in the record, and most of the correspondence between Doors Touring and Manzarek on the one hand, and St. Paul's lawyers on the other hand, is in the record. And one of those pieces of correspondence is a May 4, 2005 letter that walks through all of the decisions we've talked about, that uses the words, for example, the insurance could reasonably understand the endorsement, and goes on to explain separate possible understandings that were consistent with their expectation of coverage. So to say the record has no evidence of alternative interpretations, not quite accurate. At the end of the day, and I think Mr. McCluskey does a nice job of merging these arguments together, there are really separate and independent arguments here. Obviously, as I said earlier, our first one is that this exclusion is not enforceable, because that's the very nature of the advertising injury coverage. Now, Mr. McCluskey talked about other kinds of coverage this policy provided, and he referred to general liability. Advertising injury is part of the general liability coverage. It's what they pay the premium for. The only evidence of premium shows it was paid for the general liability coverage. This policy with this endorsement flies directly in the face of safe code, period. This endorsement in the context of selling it to someone whose business is entertainment, and then excluding this coverage for that particular business, renders coverage illusory and the endorsement invalid. We could stop there on that point, but if we go beyond, it clearly doesn't satisfy playing conspicuous clear when it's not delivered to us. When the summary that does come with the policy simply says we get a million dollars of advertising injury coverage in our field of entertainment, it doesn't say it's taken away. It doesn't talk about all they had to do was put zero in. And at the end of the day, when you start looking at the fraud allegations, and yes, we allege a whole range of bad faith conduct that includes the investigation, a biased investigation in our view. It would include relying on a policy you have not delivered. That's part of what we said. And if all of that wasn't enough, and I submit with all due respect, that's more than enough to get reversal. But if it's not, as a minimum, we are entitled to a right to try to replete, to assert other facts that we believe exist and judge real deprivance of that right. Thank you. Appreciate both your arguments. Thank you very much. Case 0655936 is submitted. And court is in recess.
judges: Goodwin, Fletcher, Smith